**FILED - LN**
September 30, 2011 3:22 PM
TRACEY CORDES, CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY __lkd___/____ SCANNED BY _____ /___

## UNITED STATES OFAMERICA
## FOR THE WESTERN DISTRICT OF MICHIGAN

**UNITED STATES and**
**STATE OF MICHIGAN,** *ex rel,*

**Tolga Kurt, M.D. and**
**Amber West**

     Plaintiff/Relator,

**COMPLAINT UNDER SEAL**

**JURY TRIAL DEMANDED**

v.

**1:11-cv-1051**
**Paul L. Maloney, Chief Judge**
**United States District Court**

**Lakeshore Spine and Pain, P.C.;**
**Mission Physical Therapy, Inc.;**
**U.S. Rehab Services, P.C.;**
**U.S. Rehabiltation Services, Inc.;**
**Babubhai Rathod;**
**Shaila Rathod; and**
**Abid Agha, M.D.**

     Defendants.

---

### COMPLAINT

This is an action brought on behalf of the United States of America by Plaintiff

Tolga Kurt, M.Dand Amber West(hereafter referred to as "Relators","Kurt" or "West") against

Lakeshore Spine and Pain, P.C., Mission Physical Therapy, Inc., U.S. Rehab Services, P.C., U.S.

Rehabilitation Services, Inc., Bububhai Rathod. Shaila Rathod, and Abid Agha, M.D.

(collectively the "Defendants") pursuant to the QuiTam provisions of the Federal Civil False

Claims Act, 31 U.S.C. §§ 3729-33 ("Federal FCA" or"FCA"), and on behalf of the Stateof

Michigan, under its State False Claims Act, MCL §§ 400.601*et seq.* ("State FCA") (together

referred to herein as "Qui Tam Action").Relators, Tolga Kurt, M.D. and Amber West, on behalf

1

referred to herein as "Qui Tam Action"). Relators, Tolga Kurt, M.D. and Amber West, on behalf of the United States of America and the State of Michigan, for their Complaint against Defendants, states as follows:

## INTRODUCTION

1.      This is an action against the Defendants for damages and civil money penalties, and other monetary relief, under the Federal FCA and State FCA.

2.      The False Claims Acts permit a person having knowledge of a violation of the False Claims Act to bring an action in federal district court for himself and for the Government, and to share in any recovery. The party is known as a relator and the action that a relator brings is called a *qui tam* action. 31 U.S.C. § 3730.

3.      The Relators in the case at bar, Tolga Kurt, M.D. and Amber West, file this qui tam action under seal pursuant to the requirements of 31 U.S.C. 3730(b)(2) and corresponding state law, and simultaneous with the filing of this Complaint, Relators have provided a written statement of all material evidence in his possession to the U.S. Attorney General and the U.S. Attorney for the Western District of Michigan..

4.      The United States and the State of Michigan are the real parties in interest, including the Department of Health and Human Services ("HHS") and its components, the Centers for Medicare and Medicaid Services ("CMS") and the Office of Inspector General, the Michigan Department of Community Health ("MDCH") and its component, Medical Services Administration ("MSA") and the Michigan Attorney General, and the Medicaid Program.

5.      The claims in this matter arise from three schemes engineered by Defendants. The first involves the Defendants' payment of kickbacks to certain physicians and other individuals in exchange for the referral of Medicare and Medicaid patients to the Lakeshore companies for the

2

furnishing of items or services reimbursable by Medicare and/or Medicaid in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b and the Michigan Health Care False Claims Act, MCL § 752.1001 *et seq*. The second scheme involves illegal referrals in violation of the Physician Self-Referral Law, 42 U.S.C. 1395nn, commonly referred to as the "Stark Law" and the Michigan Public Health Code, MCL §§ 333.16221(e) and 333.16226. The third scheme involves upcoding the billing codes for services provided to Medicare and Medicaid patients.

6.      As part of their kickback scheme, the Defendants camouflaged the kickbacks to physicians and others as "mileage" or "medical director" payments. The actual and primary purpose of the arrangement was to ensure that those physicians and others referred patients to the Defendants for services covered by Medicare and/or Medicaid.

7.      From the Defendants' vantage point, the kickback scheme "paid off" when the Defendants received reimbursement from Medicare and/or Medicaid for services rendered to patients illegally referred by those physicians and other individuals. From the physicians' and other individuals' point of view, the scheme "paid off" when they received financial remuneration from the Defendants without having to provide any rental space or other service to the Defendants or to Medicare and/or Medicaid.

8.      At the same time, the Defendants were referring patients between and among entities in which they had a financial relationship. In addition, the Defendants paid physicians employed by them for referring patients between and among entities in violation of the Stark Law, in a manner that takes into account the volume or value of any referrals by the referring physician and is not for bona fide employment items or services.

9.      From the Defendants' vantage point, the referral scheme "paid off" when the

3

Defendants received reimbursement from Medicare and/or Medicaid for services rendered to patients illegally referred between and among the related entities. From the employed physicians' point of view, the scheme "paid off" when they received financial remuneration from the Defendants in a manner that takes into account the volume or value of any referrals by the referring physician.

10. In order to participate in the Medicare and Medicaid program, Defendants had to expressly certify compliance with certain laws, including the Anti-Kickback Statute and the Stark Act.

11. Additionally, Defendants impliedly certified compliance with the Anti-Kickback Statute and the Stark Act by submitting a claim for payment to Medicare and/or Medicaid.

12. Upon information and belief, these fraudulent schemes have been employed by Defendants for years.

## JURISDICTION AND VENUE

13. This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1345.

14. This Court has personal jurisdiction over Defendants because they prepared and submitted their false claims to the Government in and from this district.

15. Venue is proper in this district under 28 U.S.C. §§ 1391(b), and 1391(c), and under 31 U.S.C. § 3732(a). Defendants can be found, reside, and transact business within the district, and the acts proscribed by the False Claims Act occurred within the district.

## THE PARTIES

16. Plaintiffs are the United States of America (the "United States" or "Government")

4

Tolga Kurt, M.D., and Amber West ("Relators").

17.     Kurt is a legal alien resident of the United States and is currently employed by Lakeshore

as a physician, and has been so employed since October, 2010. West is a citizen of the United

States and is currently employed by U.S. Rehab Services, P.C. as rehabilitation director and

marketer, and has been so employed since April, 2011 . As part of his duties, Kurt is responsible

for assessing, diagnosing and treating patients. As a part of her duties, West is responsible for

marketing therapy services and management of all therapists and staff for U.S. Rehab Services,

P.C. offices in Mt. Pleasant, Michigan, Edmore, Michigan, Alma, Michigan, Grand Rapids,

Michigan, Howard City, Michigan, Lansing Michigan, Gladwin, Michigan, and Beaverton,

Michigan.

18.     Lakeshore Spine and Pain, P.C. is a Michigan Professional Corporation organized under

the laws of the State of Michigan with its principal place of business in Ludington, Michigan. It

does business throughout the state of Michigan. It does business as Accessible Urgent Care,

Lakeshore Family Practice, Lakeshore Visiting Physicians, Lakeshore Health Care Services,

After Hours Urgent Care, Accessible Health Care "Urgent Care", James Street Clinic Services,

and Lakeshore Health Park.

19.     Mission Physical Therapy, Inc. is a Michigan Corporation organized under the laws of

the State of Michigan with its principal place of business in Mt. Pleasant, Michigan. It does

business throughout the state of Michigan. It also conducts business as U.S. Rehab Services of

Michigan.

20.     U.S. Rehab Services, P.C. is a Michigan Professional Corporation organized under the

laws of the State of Michigan with its principal place of business in Mt. Pleasant, Michigan. It

5

does business throughout the state of Michigan. It does business as Physical Therapy & More, and Clare Physical Therapy.

21.   U.S. Rehabilitation Services, Inc. is a Michigan corporation with offices in Reed City, Michigan, and, according to advertising, is staffed by Defendant Abid Agha, M.D.

22.   Babubhai ("Bob") Rathod is an individual. According to the records of the State of Michigan Department of Licensing and Regulatory Affairs, he appeared in 2003 as the President and resident agent of U.S. Rehab. Services, P.C. Although he is not listed as an owner of any of the corporate defendants, he controls and effectively owns all the corporate defendants.

23.   Shaila Rathod is, upon information and belief, the wife of Babubhai Rathod and is the incorporator of  U.S. Rehab Services, P. C.; and Mission Physical Therapy, dba U.S. Rehab. Services of Michigan.

24.   Abid Agha, M.D. is the incorporator of Lakeshore Spine and Pain, P.C., and, upon information and belief, receives kickbacks or referral fees from one or more of the Rathod related entities for performing EMG testing. He is also identified in internet advertising as staffing the U.S. Rehabilitation Services, P.C. office in Reed City, Michigan.

## THE LAW

25.   The False Claims Act (FCA) provides, in pertinent part that:

   (a)   Any person who (1) knowingly presents, or causes to be
         presented, to an officer or employee of the United States
         Government or a member of the Armed Forces of the United States
         a false or fraudulent claim for payment or approval; (2) knowingly
         makes, uses, or causes to be made or used, a false record or
         statement to get a false or fraudulent claim paid or approved by the

6

> Government; (3) conspires to defraud the Government by getting a
> false or fraudulent claim paid or approved by the Government; . . .
> or (7) knowingly makes, uses, or causes to be made or used, a false
> record or statement to conceal, avoid, or decrease an obligation to
> pay or transmit money or property to the Government,

\* \* \*

> is liable to the United States Government for a civil penalty of not
> less than $5,000 and not more than $10,000, plus 3 times the
> amount of damages which the Government sustains because of the
> act of that person . . . .

> (b)   For purposes of this section, the terms "knowing" and
> "knowingly" mean that a person, with respect to information (1)
> has actual knowledge of the information; (2) acts in deliberate
> ignorance of the truth or falsity of the information; or (3) acts in
> reckless disregard of the truth or falsity of the information, and no
> proof of specific intent to defraud is required.

31 U.S.C. § 3729. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999

26.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that payoffs to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable

7

patient population. To protect the integrity of the program from these difficult-to detect harms, Congress enacted a per se prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. See Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

27.     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs:

        (b)     Illegal remuneration

* * *

        (2)     whoever knowingly and willfully offers or pays any
                remuneration (including any kickback, bribe, or rebate) directly or
                indirectly, overtly or covertly, in cash or in kind to any person to
                induce such person --

                (A)     to refer an individual to a person for the furnishing or
                        arranging for the furnishing of any item or service for
                        which payment may be made in whole or in part under a
                        Federal health care program, or

                (B)     to purchase, lease, order or arrange for or recommend

8

> purchasing, leasing or ordering any good, facility, service,
>
> or item for which payment may be made in whole or in part
>
> under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not
>
> more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Violation of the statute can also subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

28.    The Physician Self-Referral, 42 U.S.C. 1395nn, commonly referred to as the "Stark Law", was enacted in 1989. It is intended prohibit financial relationships which pose a risk of program or patient abuse.

29.    The Stark Law prohibits a physician from making referrals for certain designated health services payable by Medicare to an entity with which he or she, or an immediate family member, has a financial relationship and prohibits the entity from presenting or causing to be presented claims to Medicare for those referred services.

30.    The Stark Law further prohibits remuneration to employees is the amount of the remuneration under the employment is not consistent with the fair market value of the services or is determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician.

31.    In addition to prohibiting certain physician referrals, the Stark Law prohibits health care entities from presenting or causing to be presented any Medicare claim for designated health services provided as a result of a prohibited referral. 42 U.S.C. § 1395(a)(1)(B). Any entity that

9

collects Medicare payments for designated health services rendered pursuant to a prohibited referral must refund all collected amounts. 52 U.S.C. § 1395nn(g)(2); 42 C.F.R. § 411.353(d).

32.     Under the Stark Law, the United States will not pay for certain items or services prescribed or ordered by physicians who have improper financial relationships with the entities that furnish those items or services. One of the major purposes of the Stark Law is to reduce losses suffered by the Medicare program due to overutilization of services.

33.     The Michigan Public Health Code requires licensees to comply with the Stark Law. MCL § 333.16221(e). Physicians who refer patients in violation of the Stark Law are subject to sanctions by the Michigan Department of Community Health. MCL § 333.16226.

34.     The Michigan Medicaid False Claims Act, MCL §§ 400.601 *et seq.*, prohibits false claims in virtually the same manner as the Federal False Claims Act.

## THE MEDICARE PROGRAM

35.     Title XVIII of the Social Security Act establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program. The Secretary of HHS administers the Medicare Program through CMS. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. See 42 U.S.C. §§ 426, 426A.

36.     The Medicare program is primarily comprised of two parts. Part A, which provides basic insurance for the costs of hospitalization and post-hospitalization care. 42 U.S.C. §§ 1395c-1395i-2 (1992).

37.     Part B is a federally subsidized, voluntary insurance program that covers a percentage (typically eighty percent) of the fee schedule amount for physician and laboratory services, 42 U.S.C. §§ 1395k, 1395l, 1395x(s), as well as durable medical equipment ("DME") and certain drug products and supplies. 42 U.S.C. § 1395k; 42 C.F.R. § 410.10.

10

## THE MICHIGAN MEDICAID PROGRAM

38.     The Michigan Medicaid Program is a Federal-State health insurance program that is jointly-funded to provide assistance for eligible low-income people.

39.     The Federal government, through HHS and CMS, provides national guidelines, matching funds and oversight of the Michigan Medicaid Program.

40.     The State Government, through MDCH and MSA, is responsible for the administration and supervision of the Michigan Medicaid Program.

41.     MDCH issues manuals to providers (the "Medicaid Provider Manual") that are an essential source of information from MDCH to providers regarding Medicaid coverage policies.

## THE FRAUD SCHEMES

42.     At all times relevant to this Complaint, Babubhai "Bob" Rathod, owned or controlled the Defendant companies.

43.     At all times relevant to this Complaint, the Defendant companies participated in Medicare and Medicaid or other federally funded programs and submitted claims under such programs.

44.     At all times relevant to this Complaint, the Medicare and Medicaid programs constituted significant sources of gross patient revenue for the Defendants.

### Kickbacks to Non-Defendant Employed Physicians in Violation of Anti-Kickback Statute

45.     In exchange for the referral of Medicare and/or Medicaid patients to the Lakeshore companies, the Defendants paid certain referring physicians who were not or are not employed by one of the Defendant companies a payment for the referrals. The Defendants paid these physicians a set amount for each patient referred by the referring physicians.

11

46.     In an attempt to conceal the true nature and purpose of the kickback payments, the

Defendants devised a scheme whereby the monthly kickback checks issued to referring

physicians were characterized in the "memo" portion of each check as "mileage" or "medical

director" payments. In fact, these payments represented the referral payment for patients referred

by the physicians and were in no way based on any medical director services provided or any

mileage reimbursement due to the physicians.

47.     The Defendant companies had a practice of presenting claims to Medicare and/or

Medicaid or causing to be presented such claims for any services provided to the patients

referred to them by the referring physicians.

48.     Defendants presented claims to Medicare/Medicaid which were tainted by this improper

kickback scheme, and have done so throughout Relators' tenure with Defendants and in all

likelihood since Defendants' inception.

49.     Although the scheme is far-reaching and the amount of improper claims submitted are

numerous, representative samples of these claims are as follows:

      a.     Dr. Dan Dean is a physician not employed by one of the Defendant companies.

           In or around June 2011, he referred patients P.S., J.M. and I.S.[1], who are

           Medicare beneficiaries, to one of the Defendant companies for services. As a

           result of these referrals, Dr. Dean received payment of $300.00 from the

           Defendants as a kickback for the referrals during the month of May, 2011. Dr.

           Dean also received payments in the amounts of $1,550 and $100 for referrals in

           the months of June and July, respectively. Although billing information remains

---

[1] Patients are identified only by their initials to protect their identity and to comply with HIPAA.

solely in the control of the Defendants, Relator asserts that claims were submitted
to Medicare for the above patients.

b.      Dr. Joseph Yacisen is a physician not employed by one of the Defendant
        companies. In or around June 2011, he referred patient W.K., who was a
        Medicare beneficiary, to one of the Defendant companies for services. As a result
        of this referral, Dr. Yacisen received payment of $150.00 from the Defendants as
        a kickback for the referrals. Although billing information remains solely in the
        control of the Defendants, Relator asserts that claims were submitted to Medicare
        for the above patient.

c.      These samples are representative of the far-ranging referral kickback scheme.
        Many other physicians not employed by one of the Defendant companies are also
        involved in the referral scheme and are also paid improper referrals by
        Defendants.

50.     The above claims, which are tainted by virtue of the improper kickbacks, were false
and/or fraudulent because the Defendants had no entitlement to payment for services tainted by
the improper referral scheme.

**Kickbacks to Other Medical Professionals in Violation of Anti-Kickback Statute**

51.     In exchange for the referral of Medicare and/or Medicaid patients to the Lakeshore
companies, the Defendants paid certain medical professionals a kickback for the referrals. The
Defendants paid these other individuals a set amount for each patient referred by them to one of
the Defendant companies.

52.     In an attempt to conceal the true nature and purpose of the kickback payments, the
Defendants devised a scheme whereby the monthly kickback checks issued to referring

13

individuals were characterized in the "memo" portion of each check as "mileage" payments. In fact, these payments represented the referral payment for patients referred by the individual.

53.    The Defendant companies had a practice of presenting claims to Medicare and/or Medicaid or causing to be presented such claims for any services provided to the patients referred to Lakeshore by the referring individuals.

54.    Defendants presented claims to Medicare/Medicaid which were tainted by this improper kickback scheme and have done so throughout Relators' tenure with Defendants and in all likelihood since Defendants' inception.

55.    Although the scheme is far-reaching and the amount of improper claims submitted are numerous, representative samples of these claims are as follows:

      a.    Wanda Ottinger is a physician assistant who is not employed by one of the Defendant companies.  In or around July 2011, Ottinger referred Medicare patients J.Z., W.Z., D.N., V.Y., S.H., L.F., R.W., H.N., R.H., B.P., G.H., E.F., and C.F., to Lakeshore Visiting Physicians, a d/b/a of Lakeshore Spine and Pain, P.C. As a result of these referrals, Ottinger received payment of $550.00 from the Defendants as a kickback for the referrals.  Although billing information remains solely in the control of the Defendants, Relators assert that claims were submitted to Medicare for the above patients.

      b.    Natalie Schutte is a physician assistant employed by one of the Defendant companies.  In or around July 2011, Schutte referred Medicare patients E.M., D.H., A.K., B.H., P.C., R.B., K.A., D.G., N.D., L.K., D.D., M.S., and C.E. to Lakeshore Visiting Physicians, a d/b/a of Lakeshore Spine and Pain, P.C. As a

14

result of these referrals, Schutte received payment of $550.00 from the Defendants as a kickback for the referrals. Although billing information remains solely in the control of the Defendants, Relators assert that claims were submitted to Medicare for the above patients.

c. These samples are representative of the far-ranging referral kickback scheme. Many other medical professionals not employed by one of the Defendant companies are also involved in the referral scheme and are also paid improper referrals by Defendants.

56. The above claims, which are tainted by virtue of the improper kickbacks, were false and/or fraudulent because the Defendants had no entitlement to payment for services tainted by the improper referral scheme.

**Payments to Physicians Employed by Defendants in Violation of Anti-Kickback Statute and Stark Law**

57. Defendants also paid referrals to physicians they employed.

In exchange for the referral of Medicare and/or Medicaid patients to other Defendant companies, the Defendants paid certain referring physicians who were employed by one of the Defendant companies. The Defendants paid these physicians set amount for each patient referred by the referring physicians.

58. The amount paid to the Defendant employed physicians was determined in a manner which takes into account (directly or indirectly) the volume or value of any referrals by the referring physician. These payments were not for bona fide employment items or services.

59. In an attempt to conceal the true nature and purpose of the kickback payments, the Defendants devised a scheme whereby the monthly kickback checks issued to referring

15

physicians were characterized in the "memo" portion of each check as "mileage" or "medical director" payments. In fact, these payments represented the referral payment for patients referred by the physicians to other Defendant companies and were in no way based on the fair market value of any services provided by the referring physicians.

60.     Although billing information is solely in the possession of Defendants, upon information and belief, Defendants presented claims to Medicare/Medicaid which were tainted by this improper kickback scheme and have done so throughout Relators' tenure with Defendants and in all likelihood since Defendants' inception.

.

61.     Although the scheme is far-reaching and the amount of improper claims submitted are numerous, representative samples of these claims are as follows:

    a.     Dr. Lino Dial is a physician employed by the Defendants. In July 2011, he
            referred Medicare patients T.Z. and C.K. to other Defendant companies. As a
            result of these referrals, Dr. Dial received a referral payment of $100.00. This
            amount was determined in a manner which directly took into account the volume
            or value of the referrals and was not for bona fide employment items or services.
            Although billing information remains solely in the control of the Defendants,
            Relators assert that claims were submitted to Medicare for the above patients.

    b.     Dr. Larissa Bruma a physician employed by the Defendants. In July 2011, she
            referred Medicare patient G.C. to other Defendant companies. As a result of this
            referral, Dr. Bruma received a referral payment of $300.00. This amount was
            determined in a manner which directly took into account the volume or value of
            the referrals and was not for bona fide employment items or services. Although

16

billing information remains solely in the control of the Defendants, Relators assert that claims were submitted to Medicare for the above patients.

c.   These samples are representative of the far-ranging referral scheme. Many other physicians employed by one of the Defendant companies are also involved in the referral scheme and are also paid improper referrals by Defendants, in violation of both the Anti-Kickback Statute and Stark Law.

62.   The above claims, which are tainted by virtue of the improper payments, were false and/or fraudulent because the Defendants had no entitlement to payment for services tainted by the improper payment scheme, which violates both the Anti-Kickback Statute and the Stark Law.

## Self-Referral in Violation of Stark Law

63.   The Defendants engaged in improper self-referral by referring patients to related entities in which they had a financial relationship for certain designated health services.

64.   The Defendants further engaged in improper self-referral by paying physicians for referrals in violation of the Stark Law and no exception applies to these payments.

65.   The Defendants had a practice of presenting claims to Medicare and/or Medicaid or causing to be presented such claims for any services provided to the patients improperly referred to related entities in violation of the Stark Law and have done so throughout Relators' tenure with Defendants and in all likelihood since Defendants' inception.

## Upcoding Scheme

66.   Defendants operate a highly specialized medical company providing medical and therapy services in the field of pain management to beneficiaries with traumatic and chronic pain.

17

67.     The Michigan Medicaid Program permits a medical provider to bill Medicaid directly for services such as those provided by Defendants.

68.     Despite the clearly enunciated criteria set out in the Michigan Medicaid Provider Manual, Defendants knowingly submit claims to Medicaid which clearly do not meet the established criteria for reimbursement and have done so throughout Relators' tenure with Defendants and in all likelihood since Defendants' inception.

69.     MDCH requires that a Certificate of Medical Necessity ("CMN") be completed which must contain specific information including the medical necessity for the service being prescribed.

70.     Despite the requirements of MDCH, it is the practice of Defendants to routinely change the billing codes for patient services, as documented by the actual service providers, in order to increase Defendants' billings to Medicare and Medicaid. By way of example only:

   a.     On February 4, 2011, Kurt saw patient D.T. for an intermdiate office visit and coded the charge properly as 99203. Defendant Lakeshore changed the coding to 99204, extensive office visit, and submitted a claim to Medicaid for such service.

   b.     On February 7, 2011, Kurt saw patient M.W. for a brief office visit and coded the charge properly as 99201. Defendant Lakeshore changed the coding to 99212, limited office visit, and submitted a claim to Medicare for such service.

   c.     On February 18, 2011, Kurt saw patient M.F. for an intermediate office visit and coded the charge properly as 99203. Defendant Lakeshore changed the coding to 99204, extensive office visit, and submitted a claim to Medicare for such service.

        The foregoing incidents are representative of a pervasive scheme to overcharge for services provided and to submit inflated claims to Medicare, Medicaid and private insurers.

18

71. Defendants' billing practices have resulted in a substantial overcharge to the Michigan Medicaid Program which is derived from both federal and state funds.

## COUNT I

(False Claims Act: Presentation of False Claims)

(31 U.S.C. § 3729(a)(1) & MCL § 400.607)

72. Plaintiff realleges and incorporates by reference ¶¶ 1 through 71 as though fully set forth herein.

73. By virtue of the acts described above with respect to Defendants' payment of kickbacks to physicians and others in exchange for the referral of federal health care program patients to the Lakeshore companies, self-referral in violation of the Stark Law and upcoding, Defendants knowingly presented false or fraudulent claims for payment or approval, or knowingly caused false or fraudulent claims for payment to be presented for payment or approval, to the United States, in violation of 31 U.S.C. § 3729(a)(1) and/or to the State in violation of MCL 400.607.

74. The false claims for payment or approval presented or caused to be presented by Defendants include, but are not limited to, all claims submitted to Medicare and Medicaid by Defendants for services rendered to patients referred to Defendants by physicians and others who received kickbacks from Defendants in exchange for the referral of goods or services, all claims submitted to Medicare and Medicaid by Defendants for services rendered to patients referred between and among the related entities of Defendants, and all claims submitted by Defendants which were improperly upcoded.

75. By virtue of the false claims presented or caused to be presented by Defendants, the United States and the State of Michigan have suffered actual damages, and are entitled to recover

19

three times the amount by which it was damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT II

(False Claims Act: False Record or Statement)

(31 U.S.C. § 3729(a)(2) & MCL § 400.607)

76. Plaintiff realleges and incorporates by reference ¶¶ 1 through 75 as though fully set forth herein.

77. By virtue of the acts described above with respect to Defendants' repeated certifications that they would comply with all laws, regulations, and guidance concerning proper practices for Medicare providers, Defendants knowingly made and used or caused to be made and used false records or statements to get false or fraudulent claims paid or approved by the United States.

78. The false claims for payment or approval presented or caused to be presented by Defendants include, but are not limited to, all claims submitted to Medicare and Medicaid by Defendants for services rendered to patients referred to Defendants by physicians and others who received kickbacks from Defendants in exchange for the referral of goods or services, all claims submitted to Medicare and Medicaid by Defendants for services rendered to patients referred between and among the related entities of Defendants in violation of the Stark Law, and all claims submitted by Defendants which were improperly upcoded.

79. The false records or statements include all provider/supplier enrollment applications signed by the Defendants in which they certified that they would comply with all laws, regulations, and guidance concerning proper practices for Medicare suppliers and the submission

20

of claims knowing they were in violation of the Anti-Kickback Statute and Stark Law and corresponding State of Michigan statutes.

80. By virtue of the false records or statements used to get false or fraudulent claims paid or approved, the United States and the State of Michigan have suffered actual damages, and are entitled to recover three times the amount by which it was damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT III

(False Claims Act; Conspiring to Submit False Claims)

(31 U.S.C. § 3729(a)(3))

81. Plaintiff realleges and incorporates by reference ¶¶ 1 through 80 as though fully set forth herein.

82. Defendants entered into agreements with respect to the payment of kickbacks to physicians and others in exchange for the referral of federal health care program patients to the Defendants. Defendants, the physicians and others to whom kickbacks were paid conspired together to defraud the government in order to get false or fraudulent claims paid by the United States, in violation of 31 U.S.C. § 3729(a)(3).

83. As a result of Defendants' conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus a civil penalty of $5,500 to $11,000 for each violation.

## PRAYER FOR RELIEF

WHEREFORE, Relators, acting on behalf of and in the name of the United States of

America and the State of Michigan, demand and pray that judgment be entered as follows against the Defendants under the Federal FCA Counts and under supplemental State FCA Counts:

    (a)    In favor of the United States and the State of Michigan against the Defendants jointly and severally for treble the amount of damages to Government Health Care Programs from the illegal kickback and self-referral schemes, plus maximum civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

    (b)    In favor of the United States and the State of Michigan against the Defendants for disgorgement of the profits earned by Defendants as a result of their illegal schemes;

    (c)    For all costs of the FCA civil action; and

    (d)    In favor of the Relators and the United States and the State of Michigan for such other and further relief as this Court deems to be just and equitable.

Respectfully submitted,

Fortino, Rlaxton & Costanzo, P.C.

Dated: 9/28/11

Charles M. Fortino

## DEMANDFOR TRIAL BY JURY

NOW COMES Plaintiff/ Relator, by and through his attorney, Charles M. Fortino, and hereby requests a trial by jury in the above-captioned matter.

Respectfully submitted,

Fortino, Plaxton & Costanzo, P.C.

Dated: 9/28/0

Charles M. Fortino